JUDGE GRIESA

12 CIV 0719

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ALBERTO MUNIZ,

                  Plaintiff,

   – against –

CITY OF NEW YORK; Commissioner DORA B.
SCHRIRO; Chief of Department LARRY DAVIS, SR.;
Deputy Commissioner FLORENCE FINKLE;
Deputy Chief of Security CARMINE LABRUZZO;
Warden ROBERT CRIPPS; Correction Officer
HANSEN; Correction Officer MIGNAUT;
Corrections Officers JOHN/JANE DOES #1-8,

                  Defendants.
-----------------------------------------------------------x

12 Civ. _____

**COMPLAINT AND
JURY DEMAND**

**ECF CASE**

[RECEIVED JAN 30 2012 U.S.D.C. S.D.N.Y. CASHIERS stamp]

## PRELIMINARY STATEMENT

1.    This is a civil rights action brought by plaintiff Alberto Muniz for damages pursuant to 42 U.S.C. § 1983. On or about December 2, 2010, while in the custody of the New York City Department of Correction ("DOC" or "the Department") at the Anna M. Kross Center, Mr. Muniz was brutally beaten by DOC staff members and struck in the head while handcuffed on the floor in violation of his rights under the Fourteenth Amendment to the United States Constitution. Mr. Muniz is a barber, student, and the father of two sons. Most shockingly, the assault ruptured Mr. Muniz's eardrum – an injury commonly associated with torture and cruel, inhuman, and degrading treatment, and specifically associated with staff beatings in the New York City jails. Among the other serious injuries that Mr. Muniz sustained as a result of the assault were cuts and bruises to his face and body. As a result of this illegal and unjustified assault, Mr. Muniz has suffered and continues to suffer partial hearing loss.

1

2.  The Department and its supervisors are, and have been, aware that Department staff members persistently use brutal force and cause prisoners serious injuries, and they have consistently, for years, failed to take meaningful and effective steps to curb the staff brutality in the jails. The incident involving Mr. Muniz is part of a pattern of incidents where DOC officers use excessive and injurious force to command, control, or discipline inmates.

3.  Mr. Muniz now seeks redress against the DOC employees who beat him, their supervisors, and the City of New York.

## JURISDICTION AND VENUE

4.  This action arises under the Fourteenth Amendment to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

5.  The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a).

6.  The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

7.  Plaintiff demands trial by jury in this action.

## PARTIES

8.  Plaintiff Alberto Muniz is a citizen of the United States and is currently incarcerated in Clinton County, New York. On or about December 2, 2010, at the time DOC staff assaulted him, Mr. Muniz was detained at the Anna M. Kross Center on Rikers Island in East Elmhurst, New York.

9.  Defendant City of New York ("City") is a municipal corporation which, through its Department of Correction, operates a number of detention facilities. The Department,

through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting and investigation of force by uniformed staff, and access to medical and other program services mandated by local law and court orders. In addition, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten Department policies or customs. The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

10. At all times relevant hereto, Defendant Dora B. Schriro was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of her employment as such, and acting under color of state law. On information and belief, defendant Schriro, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, defendant Schriro is also responsible for the care, custody, and control of all inmates housed in the Department's jails. As Commissioner, Schriro was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails. In addition, at all relevant times, defendant Schriro was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York. Defendant Schriro is sued in her individual capacity.

11. At all times relevant hereto, Defendant Larry Davis, Sr. was the Chief of

3

Department of DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law. As Chief of Department, he was the highest ranking uniformed member of the department, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the Department jails. He was also responsible for the care, custody, and control of all inmates in the Department jails. As Chief of Department, Davis is provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant Davis is sued in his individual capacity.

12. At all times relevant hereto, Defendant Florence Finkle was the Deputy Commissioner of the Department, Investigation Division. As Deputy Commissioner, her responsibilities included supervising the investigation of any and all incidents in which any employee of the Department used force against any inmate, or is alleged to have used force, and recommending Department discipline against staff believed to have violated Department policies and rules, including those concerning use of force. Defendant Finkle was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant Finkle is sued in her individual capacity.

13. At all times relevant hereto, Defendant Carmine Labruzzo was the Deputy Chief of Security of the Department. As Deputy Chief of Security, his responsibilities include supervision and oversight over the uniformed personnel of the Department with respect to maintenance of security in the jails, including enforcement of the Department of Correction's written use of force policy. Prior to the incident involving plaintiff Muniz, and over an extended period of time, Labruzzo engaged in, encouraged and tolerated the misuse of force in Department facilities where he worked. As a Captain in the Central Punitive Segregation Unit ("CPSU"),

Labruzzo was charged at least five times with violating the Department's use of force policy in incidents in which he was involved. Subsequently, when promoted to Warden of the George R. Vierno Center, Labruzzo supervised staff in a facility in which significant numbers of inmates were seriously injured in use of force incidents, and took no meaningful steps to address or remediate the problem. In his role as Warden, Defendant Labruzzo was sued on several occasions due to his failure to stop ongoing incidents of excessive and unjustified force by correctional officers of which he was aware. Defendant Labruzzo is sued in his individual capacity.

14. At all times relevant hereto, Defendant Robert Cripps was the Warden of the Anna M. Kross Center within the DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law. As Warden, his responsibilities included the care, custody, and control of all inmates, as well as the supervision of all staff, in the Anna M. Kross Center. Defendant Cripps is sued in his individual capacity.

15. At all times relevant hereto, Defendant Hansen was a correction officer within the DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, Defendant Hansen worked at the Anna M. Kross Center at the time of the incidents alleged herein, and participated or witnessed and failed to intervene in the beating of Mr. Muniz that took place on December 2, 2010. Defendant Hansen is sued in his individual capacity.

16. At all times relevant hereto, Defendant Mignaut was a correction officer within the DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law. On information and

belief, Defendant Mignaut worked at the Anna M. Kross Center at the time of the incidents alleged herein, and participated or witnessed and failed to intervene in the beating of Mr. Muniz that took place on December 2, 2010. Defendant Mignaut is sued in his individual capacity.

17. At all times relevant hereto, Correction Officers John/Jane Does # 1-8 (collectively referred to herein as the "Doe Defendants"), whose actual names and shield numbers plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe" and "Jane Doe," were officers of DOC, acting in the capacity of agents, servants, and employees of defendant City, within the scope of their employment as such, and acting under color of state law. On information and belief, the Doe Defendants worked at the Anna M. Kross Center and participated or witnessed and failed to intervene in the assault on Mr. Muniz that took place on December 2, 2010. Defendants John/Jane Does # 1-8 are sued in their individual capacities.

18. John/Jane Does # 1-8, as well as defendants Schriro, Davis, Finkle, Labruzzo, Cripps, Hansen, and Mignaut are collectively referred to as the "Individual Defendants."

19. Defendants Schriro, Davis, Finkle, Labruzzo, and Cripps are collectively referred to as the "Supervisory Defendants."

## STATEMENT OF FACTS

**New York City's Jails: A History of Abuse**

20. For decades, through Department reports and civil litigation, DOC has been aware of the routine, dangerous and unconstitutional use of excessive force by staff at

individual facilities in the large, multi-jail New York City Department of Correction.[1]

21. For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit (CPSU). That litigation unearthed abuse of prisoners and its cover-up sufficiently serious to merit criminal prosecutions of DOC staff members and the entry of a comprehensive, detailed consent decree imposing substantial obligations on the Department to address the systemic causes of the staff brutality.

22. *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the widespread practice of using excessive force against inmates incarcerated in New York City's jails. This litigation revealed significant numbers of credible excessive force complaints from prisoners who had been seriously injured by staff in the City jails. The settlement of this class action was intended to provide meaningful improvements in the training, practice and supervision of agency staff and investigators, and changes in the Department's use of force policy. However, the settlement has failed to deter the use of excessive force by correctional officers against inmates.

23. On information and belief, the number of incidents in which use of force has resulted in class A injury (an injury requiring medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid) to staff and/or the inmate(s) has steadily increased over the last several years. In 2008, there were 88 such incidents reported,

---

[1] *See, e.g., Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988), *injunction entered*, 718 F. Supp. 1111 (1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990) (Correction Institution for Men); *Jackson v. Montemagno*, 85 Civ. 2384 (AS) (E.D.N.Y.) (Brooklyn House of Detention); *Reynolds v. Ward*, 81 Civ. 101 (PNL) (S.D.N.Y.) (Bellevue Prison Psychiatric Ward); *Sheppard v. Phoenix*, 91 Civ. 4148 (RPP) (S.D.N.Y.) (Central Punitive Segregation Unit).

followed by 109 incidents in 2009 and 128 incidents in 2010.

24. Through DOC's elaborate reporting system, the Supervisory Defendants – Schriro, Davis, Finkle, Labruzzo, and Cripps – are aware of the pattern of a large number of incidents involving the use of unnecessary and/or excessive force to injure, and not restrain, inmates and have failed to take sufficient steps to stop these instances of excessive force from continuing.

25. The Department and the Supervisory Defendants are also aware of the failures of DOC's Investigation Division to adequately investigate allegations of misconduct, a practice that causes further abuse.

26. The Department and the Supervisory Defendants have not taken sufficient steps to curb the abuse that occurs on a frequent basis in New York City jails. The Department and the Supervisory Defendants are aware of the failure of the Department to bring effective disciplinary charges against its officers who use unnecessary and excessive force on prisoners and/or who fail to accurately and honestly report it, which leads to the ongoing practice of unnecessary and excessive force by correction officers against inmates.

27. The Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in New York City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

**Perforated Eardrums in New York City's Jails**

28. The perforated eardrum is an injury associated with the infliction of torture. *See* U.N. Office of the High Commissioner for Human Rights, *Istanbul Protocol: The Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ¶ 179 (2004) ("Trauma to the ears, and especially rupture

8

of the tympanic membrane, is a frequent consequence of harsh beatings. . . . A common form of torture, known in Latin America as *telefono*, is a hard slap of the palm to one or both ears, rapidly increasing pressure in the ear canal, thus rupturing the drum.").

29. Unfortunately, the prevalence of perforated eardrums following applications of force in the New York City jails is not new to DOC.

30. In the *Sheppard* litigation, former Commissioner Jacobson described the injury as one "associated" with use of excessive force by corrections officers in the CPSU against inmates.

31. Prior to the resolution of the *Sheppard* litigation, approximately 35 prisoners sustained perforated eardrums in the CPSU over a period of seven years.

32. After a settlement was announced in the *Sheppard* litigation, former Commissioner Kerik denied that DOC staff continued to inflict perforated eardrums, stating, "That kind of thing doesn't happen here anymore." *See* Christopher Drew, "Rikers Island Guards Made 'House of Pain' for Inmates," *New York Times*, August 16, 1998. But Commissioner Kerik's assessment was wrong.

33. According to documents disclosed during the *Ingles* litigation, approximately 15 inmates suffered perforated eardrums over a period of three years from 2000 to 2003.

34. And again, during June 2008 and October 2008, a time period subject to scrutiny and exposure to date because of other litigation against the DOC arising out of this precise injury, at least four inmates suffered perforated eardrums inflicted by DOC staff.

35. Through DOC's elaborate reporting system for use of force reports, the Supervisory Defendants are aware of the instances where corrections officers inflict excessive

force on inmates, resulting in perforated eardrums of inmates. They have also been made aware of the failures of DOC's Investigation Division to adequately investigate allegations of perforated eardrums, a practice that causes further abuse. These Supervisory Defendants cannot credibly contend that they are unaware of the pattern of perforated eardrum injuries in New York City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

36. Moreover, the Supervisory Defendants knew of this pattern of perforated eardrums prior to and including at the time of the assault on Mr. Muniz, but failed and continue to fail to take meaningful steps to stop this horrific practice.

**Assault on Alberto Muniz on December 2, 2010**

37. On or about November 30, 2010, Mr. Muniz underwent minor surgery at Bellevue Hospital for a routine health matter.

38. On or about December 1, 2010, Mr. Muniz was discharged from Bellevue and returned to the Anna M. Kross Center ("AMKC") at Rikers Island. That day Mr. Muniz was seen at the AMKC clinic, where, based on the discharge instructions issued by Bellevue, he was instructed to attend a follow-up appointment the next day to remove the surgical dressing and obtain medication.

39. On the evening of December 2, 2010, Mr. Muniz went to the medical clinic at AKMC in order to obtain his daily insulin shot as well as the dressing change and medication ordered the previous day.

40. Upon arriving at the medical clinic, Mr. Muniz presented his pass authorizing his receipt of medication to Defendant Hansen.

41. On information and belief, Defendant Hansen is the steady clinic officer

on a 3:00 p.m. to 11:00 p.m. shift.

42. Defendant Hansen told Mr. Muniz that he was not going to allow Mr. Muniz to obtain the medication.

43. Defendant Hansen told Mr. Muniz to step outside of the clinic.

44. Mr. Muniz explained that he needed medication for his recent surgery.

45. Defendant Hansen stated, "You better leave before I take you out." He began removing his belt and handheld radio as he said this to Mr. Muniz.

46. Mr. Muniz asked Defendant Hansen to call his area supervisor in order to confirm that Mr. Muniz was supposed to receive the medication.

47. Defendant Hansen said to Mr. Muniz, "Fuck you. You're not seeing anybody."

48. Defendant Hansen took off his belt and grabbed Mr. Muniz around his legs.

49. When Defendant Hansen grabbed Mr. Muniz by his knees, Mr. Muniz fell backward into a plexiglass wall with a metal frame.

50. Mr. Muniz hit his eye on the metal frame, causing a cut on his face.

51. While Mr. Muniz was bleeding, Defendant Hansen used his hands to repeatedly strike Mr. Muniz's body and back.

52. Mr. Muniz was shocked by Defendant Hansen's actions and covered himself to protect himself from Defendant Hansen's blows.

53. Defendant Mignaut witnessed Defendant Hansen's assault on Mr. Muniz, but failed to stop Defendant Hansen from continuing his assault.

54. As he stood to try and leave the clinic, Mr. Muniz attempted to defend

himself from Defendant Hansen's blows by putting his own hands up.

55. Mr. Muniz ran out of the clinic in order to escape further injury from Defendant Hansen.

56. The Doe Defendants #1-8, known as a "response" or "probe team," arrived to restrain Mr. Muniz in the hallway outside of the clinic.

57. The Doe Defendants wore heavy boots, body armor and helmets.

58. The Doe Defendants handcuffed Mr. Muniz's hands behind his back.

59. As Mr. Muniz was lying on the floor handcuffed, the Doe Defendants kicked Mr. Muniz several times in the head, back and right hand without any justification or provocation.

60. As Mr. Muniz was lying on the floor handcuffed, Defendant Hansen left his post in the clinic and walked towards Mr. Muniz in the hallway outside of the clinic.

61. Mr. Muniz saw Defendant Hansen walking towards him and said to the Doe Defendants, "He's going to hit me. Don't let him close to me."

62. The Doe Defendants did not stop Defendant Hansen from walking towards Mr. Muniz.

63. Defendant Hansen walked up to Mr. Muniz as he lay handcuffed on the floor and kicked him several times in the head, including a blow to his ear, without any justification or provocation.

64. The Doe Defendants and Defendant Hansen were aware and intended that the blows they inflicted upon Mr. Muniz would cause harm and physical injury to Mr. Muniz.

65. Mr. Muniz was stunned by the blows and immediately felt a sharp pain in his ear.

66. Defendant Hansen's kicks caused Mr. Muniz to experience severe pain in his ear.

67. Upon information and belief, the Doe Defendants were standing nearby witnessing this assault and did nothing to stop Defendant Hansen's attack.

68. After Defendant Hansen's attack, Correction Officer Roman picked Mr. Muniz up off the floor and escorted him to the intake area.

69. Mr. Muniz was left in the intake area for a number of hours before he was taken to the Urgi-care facility on Rikers Island.

70. During this time, Mr. Muniz felt pain in his ear, hands, and back. He had swelling on his head and boot marks on his face and body.

71. A clinic physician found that Mr. Muniz's left ear drum had been ruptured and that there was swelling, abrasions and contusions on the left side of his face and head.

72. Mr. Muniz was falsely given an infraction for assaulting correctional officers.

73. After a hearing, Mr. Muniz was found guilty of assaulting the correctional officers and sentenced to 110 days in punitive segregation.

74. As a result of these assaults, Mr. Muniz suffered serious physical and emotional injuries, including a ruptured eardrum, partial hearing loss, and back and hand pain.

75. At no time prior to or during the assaults did Mr. Muniz make any aggressive gesture toward any officer or supervisor or present any risk of harm to any officer or supervisor.

76. At no time did Mr. Muniz assault or attempt to assault any officer, nor did he present a threat or perceived threat to the personal safety of any officer or to the security of

the jail so as to warrant the repeated application of blows.

77. Mr. Muniz did not provoke his beating nor did he conduct himself in any manner that would warrant any use of force, much less the excessive force actually used.

78. Defendants Hansen, Mignaut, and the Doe Defendants acted sadistically and maliciously and demonstrated deliberate indifference toward Mr. Muniz's rights and his physical well-being.

79. Defendants Hansen, Mignaut, and the Doe Defendants failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Muniz.

80. Mr. Muniz timely filed a written notice of claim with the Comptroller's Office at 1 Centre Street, New York, New York.

81. More than 30 days have passed since the filing of the notice of claim, and the City has not settled the action.

82. This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983/Fourteenth Amendment
### (Against All Individual Defendants)

83. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

84. By reason of the foregoing, and by assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Individual Defendants from doing so, defendants deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment of the

United States Constitution to be free from gratuitous and excessive force.

85. Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC officers and employees. Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. These defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution.

86. Defendants Schriro, Davis, Finkle, Labruzzo, and Cripps knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on plaintiff. Their failure to take measures to curb this pattern of brutality constitutes an acquiescence in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of plaintiff's beating, and the failure of these defendants to take remedial action and provide adequate medical care despite the fact that the misuse of force in City jails had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including plaintiff. These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

87. As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourteenth Amendment**
**(Against Defendant City)**

88. Plaintiff repeats and realleges the foregoing paragraphs as if the same

were fully set forth at length herein.

89. Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of plaintiff's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the plaintiff.

90. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which plaintiff was subjected to a brutal beating, defendant City has deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from gratuitous and excessive force and retaliation.

91. As a direct and proximate result of the policy, practice and custom detailed above, plaintiff sustained the damages hereinbefore alleged.

**AS AND FOR A THIRD CLAIM FOR RELIEF**
**Negligent hiring/training/retention of**
**Employment Services**
**(Against Defendant City)**

92. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

93. Defendant City, through the DOC, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

94. Upon information and belief, all of the Individual Defendants were unfit and incompetent for their positions.

95. Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the Individual Defendants were potentially dangerous.

96. Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused each of plaintiff's injuries.

97. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
**Assault and Battery**
**(Against All Defendants)**

98. Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

99. In assaulting, battering, and threatening Plaintiff, or standing by and failing to intervene when plaintiff was assaulted, the individual Defendants, acting in their capacities as DOC officers, and within the scope of their employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Plaintiff.

100. The assault and battery by these Defendants was unnecessary and unwarranted in the performance of their duties as DOC officers and constituted an unreasonable and excessive use of force.

101. Defendants, their officers, agents, servants, and employees were responsible for Plaintiff's assault and battery. Defendant City, as employer of each of the

Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

102.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff requests that the Court grant the following relief jointly and severally against defendants:

1. Compensatory damages in an amount to be determined at trial for the physical and psychological injuries sustained by Mr. Muniz as a result of the events alleged herein.

2. Punitive damages against the Individual Defendants in an amount to be determined at trial.

3. An order awarding plaintiff reasonable attorneys' fees, together with the costs of this action.

4. Such other further relief as the Court may deem appropriate.

Dated: January 30, 2012
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

*/s/ Vasudha Talla/*

Jonathan S. Abady (JA 5147)
Katherine Rosenfeld (KR 8525)
Vasudha Talla (VT 1982)
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

THE LEGAL AID SOCIETY
Jonathan S. Chasan (JC 9018)
Mary Lynne Werlwas (MLW 6403)

199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

*Counsel for Plaintiff Alberto Muniz*